UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KIMBERLY S. HOOD,                     )
                                      )
                    Plaintiff,        )
                                      )
            v.                        )        No. 1:16-cv-03198-DML-JMS
                                      )
NANCY A. BERRYHILL,                   )
                                      )
                    Defendant.        )

## <u>Order on Complaint for Judicial Review</u>

Plaintiff Kimberly Hood applied for disability insurance benefits ("<u>DIB</u>")

and/or supplemental security income ("<u>SSI</u>") from the Social Security

Administration ("<u>SSA</u>") on August 16, 2013, alleging an onset date of July 9, 2013.

[Filing No. 14 at Tr. 199.]  Her application was initially denied on January 9, 2014,

[Tr. 124], and upon reconsideration on February 20, 2014, [Tr. 138].  Administrative

Law Judge James Myles (the "<u>ALJ</u>") held a hearing on August 26, 2015.  [Tr. 39-65].

The ALJ issued a decision on September 2, 2015, concluding that Ms. Hood was not

entitled to receive disability insurance benefits or supplemental security income.

[Tr. 16.]  The Appeals Council denied review on October 18, 2016.  [Tr. 1.]  On

November 22, 2016, Ms. Hood timely filed this civil action, asking the court to

review the denial of benefits pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).

[Filing No. 1.]

# I.
## STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits … to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last … not less than 12 months." *Id*. at 217.

When an applicant appeals an adverse benefits decision, this court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the
> claimant has a severe impairment; (3) whether the claimant's
> impairment meets or equals one of the impairments listed by the
> [Commissioner]; (4) whether the claimant can perform her past work;
> and (5) whether the claimant is capable of performing work in the
> national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in

original).[1]  "If a claimant satisfies steps one, two, and three, she will automatically

be found disabled.  If a claimant satisfies steps one and two, but not three, then she

must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to

establish that the claimant is capable of performing work in the national economy."

*Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

      After Step Three, but before Step Four, the ALJ must determine a claimant's

residual functional capacity ("RFC") by evaluating "all limitations that arise from

medically determinable impairments, even those that are not severe." *Villano v.

Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  In doing so, the ALJ "may not dismiss a

line of evidence contrary to the ruling." *Id.*  The ALJ uses the RFC at Step Four to

determine whether the claimant can perform her own past relevant work and if not,

at Step Five to determine whether the claimant can perform other work. *See* 20

C.F.R. § 404.1520(iv), (v).  The burden of proof is on the claimant for Steps One

---

[1] In general, the legal standards applied are the same regardless of whether a
claimant seeks DIB or SSI. However, separate, parallel statutes and regulations
exist for DIB and SSI claims. Therefore, citations in this order should be considered
to refer to the appropriate parallel provision as context dictates. The same applies
to citations of statutes or regulations found in quoted decisions.

through Four; only at Step Five does the burden shift to the Commissioner.  *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the court must affirm the denial of benefits.  *Barnett*, 381 F.3d at 668.  When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).  An award of benefits "is appropriate where all factual issues have been resolved and the record can yield but one supportable conclusion."  *Id*. (citation omitted).

## II.
### BACKGROUND

Ms. Hood was 45 years old at the time she applied for disability insurance benefits and/or supplemental security income.  [Tr. 199.]  She has completed nine years of high school and does not have any past relevant work.  [Tr. 27 and 30.]

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Ms. Hood is not disabled.  [Tr. 31.]  The ALJ found as follows:

- At Step One, the ALJ found that Ms. Hood has not engaged in substantial gainful activity[2] since July 9, 2013, the alleged onset date.  [Tr. 21.]

- At Step Two, the ALJ found that Ms. Hood has the following severe impairments: kidney disease with a history of pyelonephritis, nonalcoholic

---

[2] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

steatohepatitis (NASH) liver disease, obesity, gastroparesis, bipolar disorder, depression, and a history of a learning disorder.  [Tr. 21.]

- At Step Three, the ALJ found that Ms. Hood does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  [Tr. 22.]

- After Step Three but before Step Four, the ALJ found that Ms. Hood has the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: [a]fter standing and/or walking for 30 minutes, the claimant requires an opportunity to sit for two minutes or work seated.  After sitting for 30 minutes, the claimant requires an opportunity to take a stretch break at the workstation.  The claimant can occasionally crouch, balance, [stoop], climb, kneel and crawl but should avoid ladders, ropes, and scaffolds.  The claimant requires restroom access in the work area.  The claimant should avoid moderate exposure to workplace hazards.  The claimant can have superficial interpersonal contact in the workplace.  Lastly, the claimant is limited to routine, unskilled work."  [Tr. 25.]

- At Step Four, the ALJ concluded that Ms. Hood does not have any past relevant work.  [Tr. 30.]

- At Step Five of the analysis, the ALJ found based on vocational expert ("VE") testimony that considering Ms. Hood's age, education, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Hood could have performed through the date of the decision.  [Tr. 30.]

### III.
#### DISCUSSION

Ms. Hood makes two primary assertions of error in the ALJ's decision, but consideration of only the first is necessary to the resolution of her appeal.

### A. The ALJ's determination to give Dr. Subhan's opinion little weight cannot be sustained.

Ms. Hood argues that the ALJ erred at Step Three and Step Five by failing to comply with 20 C.F.R § 404.1527(b) and not affording "adequate weight" to the medical source statements of Ms. Amanda Whitten, her treating therapist, and Dr. Abdul Subhan, M.D., her treating psychiatrist.  [Filing No. 17 at 31.]  Ms. Hood

argues that rather than the ALJ giving "little weight" to the opinions, he should have given controlling weight to the opinions. [Filing No. 17 at 31]. She further argues that the weight given the opinions led to an improper conclusion that she does not meet listing 12.04 and an improper RFC finding that did not include the need for absences from work. [Filing No. 17 at 32-33.] Lastly, Ms. Hood contends that the ALJ should have used the factors set out at 20 C.F.R. § 404.1527 to determine the weight to be given the opinions. [Filing No. 17 at 34.]

The Commissioner argues that the ALJ reasonably gave limited weight to the opinions, provided good reasons that are not patently erroneous, and did not need to discuss expressly every factor listed in the regulation. [Filing No. 20 at 10-12.]

Ms. Hood's argument invokes the treating physician rule. In *Scott,* the Seventh Circuit explained that a "treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306). "And even if there had been sound reasons for refusing to give [a treating physician's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit." *Id.* at 740 (citing *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations

require the ALJ to consider the length, nature, and extent of the treatment

relationship, frequency of examination, the physician's specialty, the types of tests

performed, and the consistency and supportability of the physician's opinion." *Id.*

(citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)).

The ALJ stated in relevant part:

> I also considered the opinions in Exhibit 14F and 19F, which are given
> limited weight.  On February 14, 2014, the claimant's therapist, Ms.
> Whitten, (SSR 06-3p) and physician, Dr. Abdul Subhan, opined that
> the claimant has bipolar disorder, which moderately affect[s] her daily
> functioning.  Moreover, the opinion reflects that the claimant would
> have difficulty interacting with others, difficulty working, would be off
> task during the workday, and would miss more than three days of
> work per month.  In addition, the opinion contains various limitations
> per the claimant's self-reports.
>
> Subsequently, on August 18, 2015, Abdul Subhan, M.D., opined that
> the claimant would be would be on task less than 85% of the workday.
> Further, the claimant would be absent from work more than three
> days per month secondary to her mental health symptoms.[3]  However,
> issues like absences for example, are purely speculative and the
> opinion really provides no medical basis to support such extreme
> limitations.  Moreover, the treatment notes (Ex. 5F and 13F;
> suggesting routine treatment) the claimant's activities (attending
> Bingo weekly, driving a vehicle, and some childcare for her
> granddaughter with her daughter in the vicinity) and her hearing
> demeanor are consistent with the mental residual functional capacity.

[Tr. 29-30.][4]

---

[3] The VE testified that two days a month was the maximum an individual could be
absent from work and retain competitive employment, inclusive of days where the
individual left earlier than expected.  The VE was not asked about employer
expectations as to the percentage of a day an employee would need to remain on
task to retain competitive employment.  [Tr. 63.]

[4] The medical source statements at Exhibit 14F and 19F were filled out by Ms.
Whitten, who is not an "acceptable medical source," but were reviewed and
endorsed by Dr. Subhan, who is an acceptable medical source according to the

The ALJ does not explicitly reference the factors used to evaluate Dr. Subhan's opinion. The court notes at the outset that some of the factors specified in the regulations would generally support giving weight to the opinion of Dr. Subhan, given that he is a mental health specialist who has examined Ms. Hood personally and been her treating provider for the predominance, if not the entirety, of the period at issue spanning more than two years. [Tr. 571-626; Tr. 743-807 (*see* 20 C.F.R § 404.1527(c)(1), (2), and (5)).] There is no rule that the ALJ must always adopt an opinion supported by these specific factors. At most, they create a rebuttable presumption that can be overcome by reasonable conclusions supported by substantial evidence. However, the court finds that the ALJ did not provide adequate reasons to decline giving Dr. Subhan's opinion either controlling or significant weight.

### 1. There is no reason on its face to discount Dr. Subhan's opinion.

The ALJ rejected Dr. Subhan's opinion endorsing disabling limitations that Ms. Hood would be on task less than eighty-five percent of the workday or absent from work more than three days per month secondary to mental health symptoms, because "issues like absences for example, are purely speculative and the opinion

---

regulations. [Tr. 634 and Tr. 812 (citing 20 C.F.R. § 404.1502).] The regulations treat the sources differently in some respects. For example, controlling weight can be given only to a medical opinion from an acceptable medical source. However, the regulations utilize the same factors to weigh opinion evidence regardless of that distinction. *See* 20 C.F.R. § 404.1527. Given the ambiguity regarding the source of the multiple opinions and the fact that neither the ALJ nor the parties in this suit make any substantive distinctions, the Court will analyze the one opinion at Exhibit 19F and further attribute that opinion to Dr. Subhan for sake of clarity and simplicity.

really provides no medical basis to support such extreme limitations." [Tr. 29.] The ALJ's reasoning could be interpreted as discounting the opinion on its face. The regulations do instruct an ALJ to consider the "supportability" of an opinion, by evaluating the "relevant evidence" the source provides, "particularly medical signs and laboratory findings." 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.") To begin with, the limitations themselves are not patently "extreme" on their face, such that one could immediately conclude that the limitations are unreasonable (for example when obviously contradicted, that a claimant could lift or carry zero pounds, stand, sit or walk less than one hour combined in an eight-hour day, or was literally incapable of leaving the house at all). It's not unreasonable to conclude that episodic symptoms tied to Ms. Hood's conditions, bipolar disorder and depression, *could* cause her to be off-task during a portion of an eight-hour day or cause her to miss more than three days of work a month. Additionally, the court is not persuaded that limitations of this type are "purely speculative" either. While it's true that limitations of this type cannot be as readily verified by objective testing as certain exertional or postural restrictions tied to a claimant's physical capacity, the Seventh Circuit has noted the unique nature of mental impairments, the severity of which are not easily measured through traditional medical tests. *Ziegler v. Astrue,* 336 Fed. Appx. 563, 569 (7th Cir. 2009) ("a psychiatrist's examination will often involve little more than analyzing self-reported symptoms"). *See also Medina v. California,* 505 U.S. 437, 451 (1992) ("Our cases recognize that

'[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations,' because '[p]sychiatric diagnosis ... is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.'") (quoting *Addington v. Texas,* 441 U.S. 418, 430 (1979)).

More importantly, the ALJ's conclusion that "the opinion really provides no medical basis" is entirely unsupported. Dr. Subhan's opinion is replete with medical bases used to justify the episodic limitations. The opinion references ongoing depressive symptoms, manic symptoms, and "psychotic symptoms of hallucinations, delusions [and] paranoia." [Tr. 808.] The opinion notes depressive episodes of varying frequency with symptoms "severe to the point of client reporting there are days she cannot leave her house." [Tr. 808.] "At times, client can choose behavior (such as leaving her house) despite her mood. At times she cannot. Client seems to most lose control of her mood when psychotic symptoms [are] present." [Tr. 808.] When specifically asked to explain the basis for being on task less than eighty-five percent of the day, the opinion notes that Ms. Hood "reports continued daily visual hallucinations and paranoia despite reported [medication] compliance. When client experiences visual hallucinations, she becomes panicked and is unable to focus." [Tr. 809.] The opinion further explains that Ms. Hood's "depression [and] psychotic symptoms have impacted work attendance in the past per client report. It seems likely this would continue to be the case as symptoms have at times kept

client from taking her nephew to school, other family stepped in to do so."[5]  [Tr. 809.]  The opinion also references visual hallucinations and paranoia manifest by Ms. Hood—seeing people as "evil eyed" and being out to get her affecting her interactions, "particularly if she does not feel she can leave."[6]  [Tr. 810.]  The opinion again reiterates later that a possible employment issue related to both symptoms of depression and paranoia would be attendance related.  [Tr. 811.]  The explanation supporting the opinion is not inadequate.

## 2. Dr. Subhan's Opinion is consistent with his treatment notes.

The ALJ also concluded that "treatment notes (Exs. 5F and 13F; suggesting routine treatment)," claimant's activities, and her hearing demeanor are consistent with his RFC (which did not include Dr. Subhan's limitations concerning absences

---

[5] Treatment notes support that Ms. Whitten provided therapy when a severe depressive episode interrupted Ms. Hood's ability to reliably get her nephew to and from school, such that her mother had to take over.  [Tr. 772.]

[6] Ms. Hood's testimony in response to ALJ questioning was consistent with this concern:

> Q Okay. If you were in a job sitting and you were required to perform, be productive for eight hours do you think you could do that for a week without missing?
> A No.
> Q What would be the thing most likely to cause you to interfere with your work if you were to be there eight hours?
> A The only thing I have mostly it scares me with that is the thinking things and stuff like that.  I go through and get scared and have to leave real quick.  I went to Arby's and I liked it there and, but I was so scared to go back because I thought they was out for me and they kept calling for me to come back because my boss didn't like me and I loved the job.

[Tr. 58.]

and being on task). [Tr. 29-30.] The ALJ's conclusion implies that because the listed evidence is consistent with his RFC, it is inconsistent with Dr. Subhan's opinion. The regulations do instruct the ALJ to consider "consistency" with "the record as whole" when determining the weight that should be given a medical opinion. 20 C.F.R § 404.1527(c)(4). The ALJ does not articulate in his discussion of the opinion evidence how the treatment records are inconsistent. This court, though, must read the decision as a whole and, in particular, determine whether a prior portion of the ALJ's analysis summarizing Ms. Hood's mental health allegations and treatment history could provide additional support for his conclusion. [*See* Tr. 27-28.] But the court finds that the ALJ's discussion of that evidence is problematic—for a host of reasons.

First, two of the ALJ's conclusions are logically flawed. The ALJ is required to provide a "logical bridge" between the evidence and his conclusions. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). In discounting Ms. Hood's credibility as to the severity of her condition, the ALJ takes particular care to note that the "record reflects intermittent anxiety symptoms," "ongoing" psychotic symptoms that affect functioning "at times," including "some visual hallucinations, paranoia, and delusional thoughts," specifically seeing "red eyes on people," but that "testimony suggested this was episodic." [Tr. 28.] The apparent inference is that Ms. Hood's condition is not disabling because her symptoms are episodic rather than constant (or at least more frequent). The court finds it doubtful that ongoing symptoms of the type the ALJ describes would not support the severity of Ms. Hood's condition.

Moreover, the ALJ hassupported his conclusion by noting that Ms. Hood's symptoms are episodic, but then reasons later in the decision that there is no evidence to support Dr. Subhan's episodic limitations.

Second, the decision reflects a fundamental misunderstanding of bipolar disorder. "A person suffering from bipolar disorder has violent mood swings, the extremes of which are mania—a state of excitement in which [she] loses contact with reality and exhibits bizarre behavior—and clinical depression, in which [she] has great difficulty sleeping or concentrating." *Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008). "A person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio,* 630 F.3d at 710. The ALJ "thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic." *Kangail v. Barnhart,* 454 F.3d 627, 629 (7th Cir. 2006). Bipolar disorder "responds erratically to treatment." *Bauer*, 532 F.3d at 609. "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medications supports an adverse credibility inference." *Jelinek v. Astrue,* 662 F.3d 805, 814 (7th Cir.2014). Here, the record supports that Ms. Hood has a pattern of stopping medications and decompensating, evidently because she feels better, even though others will point out she feels better because she is taking medication. [Tr.

404.] Ms. Hood was doing fairly well and holding down employment, but ran into problems that were discussed at a therapy visit shortly before the period at issue:

> [Client] has been working for a year fulltime at Arby's and this is where the issues are ongoing. [Client] is feeling threatened by her [assistant] manager who has somehow found out about her psych history and using it against her. [Client] has not been to work in the midst of this stress for a week.
>
> [Client] is having work related issues that as described to this interviewer by the [client] could easily be interpreted as paranoid delusions. [Client's] daughter however reports that the story [client] tells about work does have a basis in fact. Family is though worried that the stress of these facts may tip the balance and send [client] into a severe regression.

[Tr. 453.] The family's concerns were realized as Ms. Hood's paranoia went from affecting her attendance to severe decompensation and ultimately intervention from legal and medical authorities when she required an emergency impatient detention. [Tr. 397.] None of the ALJ's cited reasons for questioning the severity of Ms. Hood's bipolar disorder—a history of noncompliance prior to the admission, evidence of good response to treatment, declining a medication adjustment, evidence of normal presentation during examinations, her hearing demeanor, and conflicting GAF scores that are at times in the moderate range—actually conflict with Ms. Hood's claims that she would have difficulty sustaining work because of episodic symptoms. [Tr. 27-28.]

Third, while the ALJ acknowledges some ongoing and intermittent symptoms, the decision fails to explore evidence supporting the frequency of those psychotic symptoms, as well as depressive episodes and their impact on Ms. Hood's functioning. On May 21, 2014, it was noted that Ms. Hood "does continue to

experience psychotic features for brief times 2-3 times/month including momentary visual hallucination and longer-lasting delusional thought." [Tr. 790.] On September 4, 2014, Dr. Subhan noted Ms. Hood's "therapist schedule[d] this appointment as she is having some visual hallucinations, '[p]eoples eyes changes into devils eye' and it is happening 2-3 times per week." [Tr. 778.] Dr. Subhan also noted that Ms. Hood spends her time "sleeping and staying at home mostly." [Tr. 778.] On October 2, 2014, Ms. Hood agreed with her therapist "that she should be able to spend an extra two hours out of bed per day." [Tr. 774.] On December 3, 2014, during a therapy session, Ms. Hood's acuity level was described as "urgent" and as to her current functioning, it was noted that "[client] presents with bipolar [disorder], symptoms of experiencing both mania and depression, current [symptoms] being depressed. Depression [symptoms] include depressed mood, isolating behavior, fatigue, lack of interest, lack of motivation, lack of energy, difficulty completing ADL's [activities of daily living], and emotional reactivity. [Client] also experiences ongoing psychotic [symptoms] of visual hallucinations, i.e., seeing people's eyes 'flash' in an 'evil way' and paranoia. [Client's] insight into [symptoms] seems to be improving." [Tr. 772.] On March 12, 2015, it was noted that Ms. Hood had improved to the point she experienced "significant depression" two to three days a month rather than four to five days. [Tr. 760.] On April 11, 2015, "[client] reports currently being in a deep depression," "[client] reports [medication] compliance," "[client] reports increased isolation and spending more time in bed." [Tr. 754.] At the next visit, Ms. Whitten recommended that Ms. Hood

give her daughter the ability to schedule a medication review on her behalf if she "has another severe depressed episode." [Tr. 752.] On July 20, 2015, Ms. Hood's progress was described as "[client] reports [medication] compliance and is engaged in outpatient [treatment]. [Client] reports ongoing psychotic [symptoms] and reports that these [symptoms] impact her functioning at times. For example, [client] will experience [visual intrusions], become paranoid that [people] are 'out to get her' and will unfriend [people] on social media. Depression [symptoms] also remain present approximately 3/7 days/week." [Tr. 744.] Not only do the treatment notes supports ongoing and episodic symptoms that affect Ms. Hood's functioning, they also provide specific indications of the frequency of those symptoms in support of Dr. Subhan's corresponding limitations.

Fourth, the ALJ also fails to confront other conflicting evidence. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). For example, the ALJ cites to a fairly normal mental status examination on August 15, 2013, shortly after Ms. Hood was hospitalized and resumed compliance. [Tr. 27 (citing Tr. 595).] However, in the very next visit on October 17, 2013, Ms. Whitten's mental status examination of Ms. Hood was notable for depressed and anxious mood with an abnormal thought

process. [Tr. 586.] The ALJ also cites to one instance where Ms. Hood declined any medication adjustments, "suggesting her symptoms were manageable." [Tr. 28.] However, after the abnormal mental status examination in October 2013, Dr. Subhan increased her Invega dosage at the next medication management appointment. [Tr. 576.] The ALJ makes no mention in the decision of this medication change or any other medication changes. On September 5, 2014, Dr. Subhan also added Buspar to her mental health medications for complaints of visual hallucinations. [Tr. 776.] On March 25, 2015, Dr. Subhan added Lamictal to her medications. [Tr. 757.] Dr. Subhan noted that Ms. Hood was sleeping thirteen hours per day and "has taken Seroquel, Buspar and higher dose of Trileptal without benefit. Agreeable to try Lamictal to address Bipolar depression." [Tr. 756.] The continuing need for medication adjustments during the period at issue undermines the ALJ's conclusion that Ms. Hood's symptoms were manageable.

Fifth, to the extent that the ALJ suggests Ms. Hood's treatment is "routine" as a reason for giving limited weight to Dr. Subhan's opinion, [Tr. 29], and references that "two years have elapsed since the claimant's symptoms have risen to the level where she required impatient treatment," [Tr. 28], the court notes that this type of reasoning is undermined by Seventh Circuit precedent. In *Voigt*, the court explained that impatient treatment is reserved only for specific concerns, not unlike Ms. Hood's own incident in the beginning of the period at issue, and that it was impermissible "medical conjecture" for an ALJ to draw conclusions about the severity of a claimant's condition simply from the absence of ongoing

hospitalizations. *Voigt v. Colvin,* 781 F.3d 871, 876 (7th Cir. 2015). Ms. Hood regularly sees a psychiatrist for medication management, as well as a therapist for psychotherapy. As noted above, in addition to regularly scheduled appointments with each, additional appointments can and have been scheduled to address increased or severe symptoms. Ms. Hood's family has also been engaged in her treatment and supportive of her compliance with it. The ALJ does not cite any evidence of record indicating that more aggressive treatment has been recommended or declined. Other than noting the absence of additional hospitalizations, the ALJ does not explain how Ms. Hood's treatment regimen is deficient, such that it gives reason to doubt Dr. Subhan's opinion. Furthermore, the issue is symptomatic of another problem with the ALJ's decision.

The ALJ summarizes Ms. Hood's treatment records and repeatedly concludes "these most recent treatment notes are not suggestive of marked limitations." [Tr. 28.] "We have made clear, however, that ALJs are not qualified to evaluate medical records themselves, but must rely on expert opinions." *Moreno v. Berryhill*, No. 17-1954, 2018 WL 914954, at *5 (7th Cir. Feb. 16, 2018) (citing *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (remanding because the ALJ improperly "played doctor"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014 (prohibiting ALJs from "playing doctor" by summarizing the results of a medical exam without input from an expert). However, in addition to all the problems with the ALJ's analysis the court has already pointed out, his actual RFC finding lacks a basis. The ALJ gave "some weight" to the reviewing opinions of the state-agency medical consultants,

noting that they are "generally consistent with the record as a whole." [Tr. 29.] However, based on the dates of their opinions it's obvious that neither consultant reviewed the most updated treatment records from Ms. Whitten and Dr. Subhan, [Tr. 743-807], or their most recent treating opinion, [Tr. 808-12]. [*See* Tr. 89 and 105.] Additionally, their identical narratives included the following limitations:

> While [claimant's] symptoms may present some impediment to work situations with large numbers of people, it does seem that the [claimant] could deal with environments that have fewer persons in them and where stress levels are limited.

[Tr. 89 and 105.] But the ALJ's RFC does not limit the work environment in any way to provide for an inability to deal with large numbers of people. [Tr. 25.] Not only did the ALJ rely on his own assessment of the degree of limitation reflected in the updated medical records, he apparently concluded that Ms. Hood was less limited than any expert opinion of record.

### 3. The ALJ failed to develop how Ms. Hood's daily activities are inconsistent with Dr. Subhan's opinion.

The ALJ's use of Ms. Hood's daily activities is unavailing to discount Dr. Subhan's opinion. Those included "attending Bingo weekly, driving a vehicle, and some childcare for her granddaughter with her daughter in the vicinity." [Tr. 29-30.] In *Bjornson,* the Seventh Circuit explained that the "critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The

failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (See *Punzio, supra,* 630 F.3d at 712 [additional citations omitted]). The record does not necessarily indicate that these activities are even ongoing. Ms. Hood testified at the hearing that she had not babysat for her daughter in over a year. [Tr. 46.] Even when she was babysitting, her daughter was home at the time, but was freed up to get things done around the house. More importantly, the activities themselves say little about Ms. Hood's ability to sustain work over the course of day or maintain competitive levels of attendance.

For the foregoing reasons, the court finds merit in Ms. Hood's argument that the ALJ improperly gave "limited weight" to the opinion of Dr. Subhan. Dr. Subhan's opined limitation that Ms. Hood would need to be absent more than three days per month does not appear directly contradicted in the record, such that controlling weight may be appropriate. Regardless, the ALJ did not give good reasons to support the weight that the opinion was given. The court finds remand to be the appropriate remedy to reevaluate Ms. Whitten and Dr. Subhan's opinions.

### B.  The court need not address Ms. Hood's Listing argument.

Ms. Hood also argues that the ALJ's improper consideration of Dr. Subhan's opinion led to an improper conclusion that listing 12.04 was not met or equaled and

further that the ALJ improperly decided the issue of equivalence without expert guidance as to the complete record. Having found remand already required by the issue addressed above, the court need not reach this argument and declines to do so here. On remand, in addition to reevaluating the opinion evidence above, the agency should make every effort to evaluate the complete medical record with expert input.

## IV.
### CONCLUSION

For the reasons detailed herein, the court **REVERSES** the ALJ's decision denying Ms. Hood's benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above. Final Judgment will issue accordingly.

So ORDERED.

Date: 3/13/2018

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the Court's ECF system